Eastern District of Kentucky
F I L E D
NOV 09 2005
AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CIVIL ACTION NO. 04-517-GWU

RONALD W. BOWLING,                              PLAINTIFF,

VS.               **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,            DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his application for Supplemental Security Income (SSI). The appeal is currently before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial review of Social Security disability benefit cases:

1. Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, proceed to Step 2. See 20 C.F.R. 404.1520(b), 416.920(b).

2. Does the claimant have any medically determinable physical or mental impairment(s)? If yes, proceed to Step 3. If no, the claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3. Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities? If yes, proceed to Step 4. If no, the claimant is not disabled. See 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

1

4.  Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. See 20 C.F.R. 404.920(d), 416.920(d).

5.  Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. See 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6.  Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled. If no, proceed to Step 7. See 20 C.F.R. 404.1520(e), 416.920(e).

7.  Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. See 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply. Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to

support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1)

3

whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford

4

or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

5

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency

6

may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The administrative law judge (ALJ) found that Bowling suffered from "severe" borderline intellectual functioning, a mood disorder, and a history of chronic left elbow pain. (Tr. 22). Nevertheless, he believed the plaintiff retained the capacity to perform medium level work requiring no more than occasional overhead reaching with the left upper extremity. (Tr. 24). If the plaintiff stopped abusing alcohol and/or drugs,[1] Bowling would retain the ability to handle simple instructions and tasks in an object-focused setting that required no more than minimal social interaction with coworkers and supervisors and no more than incidental and superficial contact with the general public. (Id.). The plaintiff also required jobs involving no more than a rudimentary ability to read and write. (Id.). Bowling, who had no past relevant work, was found capable of engaging in the significant number of compatible jobs

---

[1] Public Law 104-121 prohibits substance abuse being the basis for any award of benefits.

7

Bowling

identified by the vocational expert (VE). (Tr. 26, 27). Thus, the application for benefits was denied. (Tr. 28).

The VE had initially been asked to assume (1) a need to reach overhead with the non-dominant extremity on no more than an occasional basis, (2) a number of "limited but satisfactory" mental abilities (Tr. 312), and (3) no more than rudimentary ability to read and write (Tr. 314). He identified specific medium jobs. (Id.). The ALJ then issued follow-up questions to find out if these jobs were compatible with (1) medium level exertional limitations and (2) a need for simple instructions, an object-focused setting, no more than minimal interaction with coworkers and supervisors and no more than incidental and superficial contact with the public (Tr. 316). The VE indicated that the same jobs would be available. (Id.).

The plaintiff filed for benefits, originally alleging that he had become unable to work since 1994[2] due to the fact he was "mentally disturbed" and unable to "stay focused on anything and [had] trouble remembering." (Tr. 77). He stated on another form that he had been a "slow learner" in school (Tr. 86) and that he spent his days in mid-2001 looking for "trouble", drugs and alcohol (Tr. 88). Later, he mentioned problems with his left arm and chest as well as worsening depression.

---

[2]The plaintiff was incarcerated from 1983 to 1992 (Tr. 139-140), and was returned for a parole violation from 1995 to 1999 (Tr. 142-143). He then served at least two years in prison on drug charges. (Tr. 113, 149, 183).

8

(Tr. 107). At the administrative hearing he stated that while his worst problem concerned his "nerves" (Tr. 291) but that he also had arm/elbow pain (Tr. 293, 303-304) for which his doctors had told him not to do any heavy lifting (Tr. 305).

A review of the medical evidence revealed that while the patient did exhibit some physical abnormalities with regard to his lungs and left elbow, no physician really imposed any physical restrictions on him.

During a psychiatric hospitalization in September, 2001, the plaintiff mentioned a history of "mild persistent asthma." (Tr. 161). He was noted to have a "stable" examination, with no obvious abnormalities other than some wheezing in the lungs and wax in the ears. (Tr. 153). A chest x-ray did show chronic obstructive pulmonary disease, and asthma medications were prescribed. (Tr. 154, 157, 180). The patient admitted he was smoking three to four packs of cigarettes a day. (Tr. 161).[3]

A consultative physical examination took place in April, 2002. Despite complaints of shortness of breath, the chest examination was normal and, the doctor added, the plaintiff admitted smoking one-half pack per day. (Tr. 195). The plaintiff complained of left elbow pain, but hand grip, digital dexterity and the passive range of motion were good. (Id.). The examiner imposed no limitations.

---

[3] See Mullins v. Secretary of HHS, 836 F.2d 980, 985 (6th Cir. 1987).

9

A medical reviewer analyzed the record and opined that the physical condition was "less than severe." (Tr. 212).

The plaintiff was again admitted to a hospital psychiatric unit, this time in November, 2003. The patient had not been taking his medications due to financial reasons and was found to have wheezes in the lungs. (Tr. 251-252). No real focus was made on the physical condition or any possible physical functional restrictions.

In December, 2003, the patient went to the Appalachian Regional Hospital's Ambulatory Patient Clinic complaining of left elbow pain. The patient mentioned two motor vehicle accident injuries, the last one of which had occurred some 15 years previously. (Tr. 270). There was good motion of the hands and good strength, but "some" decreased range of motion and "some remarkable tenderness" of the elbow. (Tr. 270). X-rays showed only an old fracture deformity of the distal humeral shaft. (Tr. 273). There was no demonstrable fracture or dislocation of the left elbow. (Tr. 267). At a follow-up appointment, the doctor suggested removal of the screws in the humerus, which the patient declined for monetary reasons. (Tr. 267-268). No specific restrictions were cited.

Certainly, then, the physical limitations assigned by the ALJ gave the patient the considerable benefit of the doubt.

Bowling

*Close scrutiny is necessary for the mental health evidence.* However, much of the plaintiff's mental health information is tainted by the impermissible substance abuse factor.

The patient was hospitalized for suicidal thoughts and diagnosed with a psychotic disorder with possible post traumatic stress disorder or schizoaffective disorder in September, 2001. (Tr. 152, 154). However, his alcohol level upon arrival was 189.8, and a substance-induced psychosis or alcohol abuse could <u>not</u> be ruled out (Tr. 154, 176). His GAF at discharge was 65[4] and <u>no</u> limitations were placed on his activities. (Id.).

I.T. Baldwin conducted a psychological evaluation in October, 2001. He felt the plaintiff was malingering on testing (Tr. 185) and considered the IQ scores he obtained invalid (Tr. 183). He listed no restrictions. (Tr. 186).

A second consultative mental health evaluation occurred in April, 2002. The plaintiff cited a history of abuse by family members, being a "slow" learner in school and a history of alcohol abuse. (Tr. 188-189). The claimant was said to give minimal effort during testing and, therefore, his IQ was "estimated" to be borderline. (Tr. 190). Mild anxiety was observed, as was defensiveness. (Id.). Some

---

[4]Scores between 51 and 60 are consistent with "moderate . . . difficulty in social, occupational or school functioning", and those between 61 and 70 are consistent with "some mild symptoms . . . but generally functioning pretty well" as per the <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th Ed.) (DSM-IV).

11

manipulativeness was observed. (Id.). No limitations beyond "fair" were noted, and it was said that his chief complaint appeared to be in relating to others. (Tr. 191). A high GAF of 65 was cited. (Id.).

Psychiatric symptoms were reported to the physical consultative examiner, but the patient was noted to be "quite vague" about his problems. (Tr. 195).

Medical Reviewer Lea Perritt evaluated the record and found there to be no "severe" impairment. (Tr. 197).

Medical Reviewer Joey Athy analyzed the record later and opined that there were several "moderate" limitations–mainly in getting along with other persons. (Tr. 227-228). He concluded that the plaintiff had the mental capacity to perform simple, repetitive work in a simple routine setting. (Tr. 229).

Exhibit 10F was introduced, containing records from the Cumberland River Comprehensive Care Center (CRCCC), indicating the plaintiff had contact with them from October, 2001 (after discharge from his psychiatric hospitalization) to December, 2002. When first seen, the patient admitted to long-standing substance abuse, childhood abuse. (Tr. 245). Intellect was assessed as below average, insight limited and his mood was sad. (Tr. 246). A GAF of 45 was cited. (Id.). No complaints were offered during the next session. (Tr. 244). The fact that his medication helped him was noted at the next session and although some suggestion

indicated the patient was interested in getting "disability," "Vocational Rehabilitation" was also referred to. (Tr. 243). The favorable response to medication was referred to during the next session; it was also noted that "he does odd jobs at times but pretends to be very dumb." (Tr. 242). Ten months later, in December, 2003, a treatment/service plan with little additional information but diagnoses (which did not include substance abuse disorders) listed a low GAF of 45. (Tr. 234).

In October, 2003, the patient was admitted to a hospital psychiatric unit for suicidal ideation. (Tr. 249). The patient was disheveled, unkempt and distracted, and exhibited a very depressed mood and constricted affect. (Tr. 252). Major depression was diagnosed with a GAF of 25. (Tr. 253).[5] Following his discharge, his follow-up was with the CRCCC where post traumatic stress disorder, abuse and borderline intellectual functioning were diagnosed and a 45 GAF was cited. (Tr. 257).

While not every single piece of evidence suggests adequate mental functioning, certainly the vast majority of the evidence prior to October, 2003 does. "No limitations" was noted on discharge from the September, 2001 hospitalization. (Tr. 154). I.T. Baldwin felt there were no restrictions later that year. (Tr. 186). A

---

[5]A drug screen done in the hospital was positive for THC (Tr. 276) despite the patient's denial of drug use. (Tr. 251).

13

Bowling

high GAF was cited in April, 2002. (Tr. 191). The medical reviewers cited either no or compatible restrictions. (Tr. 197, 229). The progress notes from CRCCC suggested improvement to the point Vocational Rehabilitation and doing odd jobs were referred to. (Tr. 242, 243). Only in the limited time frame from October, 2003 to December, 2003 were low GAFs cited by treating sources who did not diagnose substance abuse problems which would not meet the durational requirement. Significant, a drug screen as late as October, 2003 was positive for the plaintiff.

For these reasons, as well as those cited in the defendant's brief at pp. 12-13 regarding the plaintiff's minimization of his drug and alcohol abuse, the decision will be affirmed.

This the ___9___ day of November, 2005.

G. WIX UNTHANK
SENIOR JUDGE

14